**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| AARIES WOODS, mother, on behalf of X.J.H., a minor child, | ) ) ) ) 3:25-cv-268 |
| Plaintiff, | ) ) ) Magistrate Judge Patricia L. Dodge |
| vs. | ) ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff Aaries Woods ("Woods") brings this action on behalf of her minor child, X.J.H.,[1]

against the Commissioner of Social Security ("Commissioner"), under 42 U.S.C. § 405(g).

Plaintiff seeks judicial review of an unfavorable decision regarding a claim for childhood

Supplemental Security Income benefits ("SSI"). Plaintiff has moved for summary judgment, and

the motion has been fully briefed.

For the reasons set forth below, the Court will grant summary judgment in favor of Plaintiff

and remand the case to the Commissioner for further review.[2]

I.    **Procedural History**

Woods filed an application for childhood SSI on behalf of X.J.H. on February 9, 2023,

alleging that he was disabled beginning January 31, 2023. (R. 168-77.)[3] The claim was initially

denied on May 17, 2023 and again on reconsideration on August 11, 2023. (R. 64-78.) Woods took

---

[1] Because X.J.H. is a minor, his mother must bring the claim on his behalf and only his initials should be used to identify him. Fed. R. Civ. P. 5.2(a)(3), 17(c).
[2] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (ECF Nos. 13, 14.)
[3] Citations to the record (ECF No. 7) are referred to as "R."

an appeal and sought a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on June 4, 2024 before ALJ Erin Powers (R. 32-63.) ALJ Powers issued an unfavorable decision on July 24, 2024, finding that X.J.H. was not disabled under the Social Security Act. (R. 17-27.) Thereafter, Woods' request for review of hearing decision/order to the Appeals Council, and the appeal was denied on June 26, 2025. (R. 1-6.)

In August 2025, Woods commenced this action to seek judicial review of the denial of benefits. Her motion for summary judgment (ECF No. 17) has been fully briefed (ECF Nos. 18, 19).[4]

## II.    Standard of Review

"On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing § 405(g)). The Court recently explained that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.* It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S. Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Id.* at 102-03 (other citations omitted).

---

[4] Although the Commissioner did not move for summary judgment, the Supplemental Rules for Social Security indicate that "The action is presented for decision by the parties' briefs." (Supp. Rule 5.)

"An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The statute further provides that "a physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 1382c(a)(3)(D).

To evaluate disability claims for children, the Commissioner uses a three-step sequential process:

> [The] ALJ must find that (1) the claimant is not engaged in substantial gainful activity; (2) the claimant suffers from one or more severe impairments; and (3) the impairment meets, medically equals, or is functionally equivalent in severity to an impairment listed in 20 C.F.R. Pt. 404, Subpt. P. App. 1 (Listing of Impairments). If the claimant's impairments do not meet or equal any impairment specified in the Listings, the Commissioner evaluates all of the child's functional limitations caused by a disability. For a disability to be functionally equivalent, the limitations caused by the disability must be the same as the limitations caused by a listed impairment. 20 C.F.R. § 416.924 (2003).

*Matos v. Comm'r of Soc. Sec.*, 74 F. App'x 235, 236 (3d Cir. 2003).

Further:

> The regulations provide that functional equivalence to the severity of an impairment in the Listings may be determined based on domains of functioning. 20 C.F.R. § 416.926a. A medically determinable impairment or combination of impairments functionally equals a listed impairment if it "result[s] in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." *Id.* § 416.926a(a). A child's functional limitations are considered in terms of six domains: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." *Id.* § 416.926a(b)(1). A limitation is "marked" when it "interferes seriously with your ability to independently initiate, sustain, or complete activities" and marked means "more than moderate but less than extreme." *Id.* § 416.926a(e)(2)(i).

*T.C. ex rel. Z.C. v. Comm'r of Soc. Sec.*, 497 F. App'x 158, 160-61 (3d Cir. 2012).

**III.    Factual Background**

A.    <u>Medical Evidence</u>

X.J.H. was treated at Primary Health Network between February 9, 2022 and December 20, 2022. He was referred by his primary care physician for evaluation for an eating disorder (his mother saw him chewing toys and batteries but was not sure if he ingested them) but none was diagnosed. Other concerns included chronic insomnia (with reports he slept as little as three hours a night), iron deficiency anemia, abnormal lead levels in his blood, frequent headaches and pains in his leg. (R. 417-59.)

On January 31, 2023, X.J.H. was evaluated at Nulton Diagnostic & Treatment Center, which confirmed diagnoses of: (1) autism spectrum disorder diagnosis, (2) attention deficit hyperactivity disorder (ADHD) combined presentation and (3) conduct disorder—childhood onset type, noting symptoms such as repetitive behaviors, echoing others, restricted facial expressions and significant boundary issues. "He walks on his toes, rocks and bounces in place. He growls and acts like a monkey or dog. He engages in high pitched screams. He 'humps a lot.' This occurs daily. He sucks on his arm and leaves bruises. He bites his lip." According to his mother, he wants the lights on in the house all the time, does not like to wear clothes, has bowel control accidents and urinates on the floor. He had low scores on the Adaptive Behavior Assessment Scale and the Connors 3-Parent assessment yielded elevated scores in the areas of inattention, hyperactivity/impulsivity, learning problems, executive functioning, defiance/aggression and peer relations. (R. 460-62.)

Records from Nulton, where X.J.H. was treated from April 19, 2023 to January 24, 2024, noted incidents of hitting, kicking and throwing items at both peers and adults. He threatened to

kill his mother and the next day the family found a knife in his room. He had stabbed a pillow. He also made comments about shooting others. (R. 460, 467, 518.) In various incidents, he had bitten other children, cut a peer with scissors, pushed a girl and smacked a girl's private area while in Pre-K. (R. 468, 518.) Multiple instances of lying and stealing from school and stores were noted. (R. 420, 439, 446, 448, 460, 467, 518, 644.)

B. Hearing Testimony

1. X.J.H.'s testimony

At the June 4, 2024 hearing, X.J.H. briefly testified that he was seven years old and had completed first grade, but was not sure whether he would move on to second grade. He stated that he likes math and science but not phonics. He does not play sports but plays tag and football outside with his brother. (R. 40-43.)

2. Woods testimony

He was diagnosed by Nulton Diagnostic Treatment Center with autism spectrum disorder, level two. X.J.H. was seeing a therapist who came to the house twice a month, but since the therapist moved back to seeing patients in her office, it is difficult to get X.J.H. to her and he will not see anybody else. (R. 49-50.) X.J.H. takes Focalin, risperidone and clonidine, plus melatonin for sleep. According to Woods, "if he doesn't have all three of these together, he will not sleep." Even with the medications, he does not always sleep through the night. (R. 49.)

When X.J.H. was born, he had malnutrition and when he was nine months old, he weighed only ten pounds. But he gained weight when given PediaSure. (R. 56.)

Woods testified that a decision had not been made whether to hold X.J.H. back in first grade and that, if the school placed him with a different teacher, that would be a problem because he "doesn't like change." (R. 44.) She stated that he does not do his homework unless someone is

with him; otherwise, he draws all over his papers. X.J.H. has an individualized education plan ("IEP") but it had to be revised because the group he was pulled out with was too large. (R. 44-45.) She stated that he has "a lot of anxiety," "a lot of depression" and "a lot of anger." He still wears pull-ups and he will remove his excrement and hide it in the house. He also gets up in the middle of the night and steals snacks, so she had to install locks on the cabinets and refrigerator. (R. 46, 49.)

Woods found a butter knife in his school bookbag and in another incident, his brother brought her a paring knife that X.J.H. had dropped outside. She did not know if he brought it to school. (R. 46.) Woods explained that X.J.H.'s older brother is eight years old and his younger brother is two. X.J.H. has to be supervised with the younger brother because he will try to kiss him "all the time" and when the younger brother hits him, he "just goes crazy." (R. 46-47.) One night, he stole a knife, stabbed his mattress and poured red Kook-Aid on it so it looked like blood. He pushed his mother down the stairs. He has also broken devices and furniture. (R. 54.)

X.J.H. has "meltdowns." Woods testified about an incident at Walmart when he was screaming, hollering, yelling and banging his head on the ground and she had to pick him up and carry him. He has fidget toys that sometimes calm him down temporarily. (R. 48.) He's "always on the go" and that "his brain never stops" even when he's in bed. (R. 48-49.)

X.J.H. has bitten both his mother and his older brother. (R. 52.) He was kicked out of daycare for biting. (R. 60.) X.J.H. "chews on stuff that's not food. Like he eats batteries. He draws all over himself." (R. 51.) They used to have a cat, but he threw it down three flights of steps so they cannot have pets anymore. (R. 51.) At school, he "was touching other kids' private areas. He's pulling down his pants." (R. 51.) He seems to lack empathy for other people and "he starts talking about how he hates himself. Like he wants to kill people. He wants to kill himself." (R.

6

52.)

X.J.H. does not have an aide, but Woods has been looking for one. (R. 53.) She would like him to go to a special school for special kids. She was told he was "too advanced" for that but she did not understand what that meant. (R. 54.) A recent report card indicated he was doing better, but when Woods tried to sit down and read with him, "it's like he doesn't know it." He brought home a book to read, but she had to bribe him to get him to do it. (R. 54-55.)

X.J.H. was upset when a man who was living with her (not X.J.H.'s father) left and "it's like he's a baby again." (R. 55.) She has to wash him and change him. (R. 55.)

Woods has tried taking things from X.J.H. as a form of discipline, but he doesn't care. She believes that he does not know right from wrong and does not even look when he's crossing the street. She cannot leave him outside alone. (R. 56.)

The ALJ asked about a record that suggested X.J.H. had been referred to a neurologist about his inability to know when he has to use the bathroom, and his mother said that this appointment never took place. X.J.H. was given a laxative and she has been taking him to the potty when it appears he needs to go. (R. 58-59.) She also said that he hides his soiled clothes and she was not aware of them until she noticed the smell, so she had to throw them out. (R. 59.) He cannot wipe himself without making a mess and he does not like for her to wipe him either. (R. 60.)

      3.   ALJ's Decision

The ALJ concluded that: (1) X.J.H. was a school-aged child on the date the application was filed and remained a school-aged child; (2) he had not engaged in substantial gainful activity since February 9, 2023, the application date; (3) he had severe impairments of autism spectrum disorder, ADHD and oppositional defiant disorder; but (4) he did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment; (5) he did not

have an impairment or combination of impairments that functionally equals the severity of the listings; and (6) therefore, he was not disabled from February 9, 2023. (R. 18-27.)

## IV.    Discussion

The ALJ found that X.J.H. has the following severe impairments: autism spectrum disorder, ADHD and oppositional defiant disorder. The ALJ concluded, however, that these impairments, considered singly and in combination, did not meet or medically equal the criteria of Listings 12.08 or 112.08 (personality and impulse-control disorders), 12.10 (autism spectrum disorder), or 12.11 or 112.11 (neurodevelopmental disorders). (R. 18.) Woods raises two issues about his findings.

A.    Eating Disorder

Woods first argues that the ALJ erred by failing to discuss Listing 112.13 (eating disorders) in any way. Listing 112.13 provides as follows:

> A. Medical documentation of a persistent alteration in eating or eating-related behavior that results in a change in consumption or absorption of food and that significantly impairs physical or psychological health.
>
> AND
>
> B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
>
>> 1. Understand, remember, or apply information (see 112.00E1).
>>
>> 2. Interact with others (see 112.00E2).
>>
>> 3. Concentrate, persist, or maintain pace (see 112.00E3).
>>
>> 4. Adapt or manage oneself (see 112.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 112.13.

The Commissioner responds that, to the extent his omission was in error, it is harmless error because the record does not support a finding that X.J.H. met the criteria of Listing 112.13.

8

In any event, the Commissioner asserts that the ALJ explained in detail why the "B criteria" (which are the same for all of the listed impairments) were not met.

According to the Commissioner, the record does not support a finding that X.J.H. has a medically determinable eating disorder. Rather, although there was evidence that X.J.H. was underweight—in part due to side effects from stimulant medication and in part due to "picky" eating habits (R. 492, 517, 596)—there was also evidence that he gained weight when taking PediaSure (R. 658, 662), increasing from 37 pounds in October 2023 (R. 633) to 42 pounds in January 2024 (R. 603, 618). Further, although X.J.H.'s mother stated that he chewed on toys and batteries, there was no definitive evidence that he actually ingested them (R. 420, 489).

Citing *Burnett v. Commissioner, Social Security Administration*, 220 F.3d 112, 121 (3d Cir. 2000), Woods contends that the ALJ erred by failing to "give some indication of evidence which he rejects and his reason(s) for discounting such evidence." However, as the Court of Appeals later explained, "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). "We have never required an administrative law judge to identify or analyze the most relevant listing." *Wisniewski v. Comm'r of Soc. Sec.*, 210 F. App'x 177, 180 (3d Cir. 2006) (citing *Scatorchia v. Comm'r of Soc. Sec.*, 137 F. App'x 468, 471 (3d Cir. 2005) (finding that the ALJ met the *Jones* requirement at step three without identifying the relevant Listing)).

In his decision, the ALJ observed that allegations of X.J.H. "eating non-food items" was "not documented as discussed during treatment" and was not "documented as a focus of treatment." (R. 23.) As her decision discusses this issue, the ALJ's failure specifically cite Listing

112.13 does not demonstrate that the decision was not supported by substantial evidence. As a result, Woods' argument on this issue is unavailing.

B. Autism Spectrum/Neurodevelopmental Disorders

Woods also contends that with respect to Listings 112.10 and 112.11, while the ALJ found only "moderate" limitations in four of X.J.H.'s mental functioning areas, the record supports findings of either "marked" or "extreme" limitations. In addition, the ALJ relied on a few structured interactions that X.J.H. had with examiners, ignoring evidence of his ongoing severe interpersonal and behavioral problems in interacting with others, adapting or managing oneself and concentrating, persisting or maintaining pace.

The Commissioner responds that the decision is supported by substantial evidence. The Court concludes differently.

1. Interacting with others

As for the issue of interacting with others, the ALJ stated that:

> the claimant has a moderate limitation. The claimant's mother testified and reported that he has tantrums, lacks empathy, and will act aggressively toward others, while becoming angry easily (Ex. 7E; testimony). However, on examination the claimant has been observed to be cooperative and friendly (Ex. 6F/21, 36; 8F/5, 20, 35, 50, 64; 9F/22, 27, 51). Additionally, the claimant's eye contact has generally been observed to be appropriate (Ex. 6F/21; 8F/20, 64; 9F/22, 27, 51), despite an occasional deficit (Ex. 6F/7). Additionally, it was reported that the claimant has friends his own age, generally gets along with school teachers, and is able to talk with family and friends (Ex. 7E/4, 7). Furthermore, as noted in the claimant's IEP from January 2024, he is courteous toward others and showed great turn-taking skills during group work (Ex. 15E/29).

(R. 19.)

As Woods points out, the fact that on examination, X.J.H. was observed to be cooperative and friendly and his eye contact was generally appropriate does not negate the multiple reported instances of tantrums, lack of empathy and acts of aggression toward others. The Court also notes

10

that the ALJ's conclusion that X.J.H. has friends his own age appears to be based on a Function

Report on which his mother checked boxes for "talks with friends" (R. 225) and "has friends his

own age" (R. 228). But on that same form, she also checked "no" for a box titled "can make new

friends" (R. 228). More significantly, both she and X.J.H. testified that he only plays with his

brother (R. 42, 51-52). The ALJ did not discuss this testimony or sufficiently develop this issue.

2.   Concentrating, persisting and maintaining pace

With respect to concentrating, persisting or maintaining pace, the ALJ found that:

> the claimant has a moderate limitation. The claimant's mother testified that he does not do his school work and it was noted in his IEP that he has trouble sitting still during lessons (Ex. 13E/2; testimony). However, on examination, the claimant's attention and concentration have been observed to be intact (Ex. 6F/22, 37, 52, 8F/6, 21, 36, 50, 64, 78, 9F/8, 13, 18, 23, 28, 52). Additionally, the claimant's mother reported that when taking his medication, his concentration and focus had improved (Ex. 6F/18, 48; 8F/2, 17, 46, 60, 75).

(R. 19.)

Woods again notes that the fact that, on examination, X.J.H.'s attention and concentration

appeared to be intact does not negate multiple documented difficulties in completing schoolwork

and paying attention in class. His IEP reflects ongoing educational supports, including pull-out

instruction in a small group. (R. 45, 783.)

3.   Managing himself

With respect to adapting or managing oneself, the ALJ found that:

> the claimant has experienced a moderate limitation. The claimant's mother testified that the claimant has pushed her down the stairs, that he has meltdowns when he does not get what he wants, has previously been aggressive toward pets, and stabbed his mattress (testimony). However, during examinations, the claimant has been observed to be cooperative and friendly with appropriate eye contact (Ex. 6F/21, 36; 8F/5, 20, 35, 50, 64; 9F/22, 27, 51). Although the claimant has been observed to have limited judgment and insight on occasion (Ex. 6F/6), during other examinations, his judgment and insight have been observed to be intact and normal (Ex. 9F/8, 13, 18, 23, 28, 52). Furthermore, the claimant has denied any homicidal thoughts, plan, or intent (Ex. 6F/8, 22, 37, 52; 8F/6, 21, 36, 50, 65, 78).

11

> Additionally, the claimant's teacher reported that he is able to participate in class, while showing kindness and respect to others (Ex. 13E/2). The claimant was also reported to be able to brush his teeth, wash his hair, choose his clothes, and get to school on time (Ex. 7E/8).

(R. 19.)

The fact that on examination X.J.H. was cooperative and friendly with appropriate eye contact does not "balance" the facts of record. This includes pushing his mother down the stairs,[5] having meltdowns when he did not get what he wants, biting others, touching the private areas of other school children, throwing a cat down the stairs and stabbing his pillow with a knife. Nor does he know right from wrong and he cannot be left along outside. Perhaps even more troubling is that the decision includes no discussion of X.J.H.'s toilet regression and hygiene dysfunction, including repeated bowel accidents, urinating on the floor, continued use of pull-ups, hiding feces and soiled items in the home and the need for significant adult assistance with wiping and hygiene. These omitted facts raise considerable doubt that X.J.H. has only "moderate" limitations in the area of managing himself.

An ALJ "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993). *See also Platt v. O'Malley*, 2024 WL 3401329, at *4 (W.D. Pa. July 12, 2024) ("ALJs may not mischaracterize or overlook evidence.") "The ALJ is not entitled to 'cherry pick' favorable evidence and ignore records that run counter to [his] findings." *Piper v. Saul*, 2020 WL 709517, at *4 (W.D. Pa. Feb. 12, 2020).

As the decision demonstrates, the ALJ discounted without any explanation the serious issues raised by X.J.H.'s mother, which are documented in the record, including his aggression, lack of self-control and inability to manage himself. By selectively and improperly relying on

---

[5] The ALJ did not indicate that she found the mother's account of this incident to lack credibility and it is referenced in other parts of the record.

X.J.H.'s cooperative conduct during limited examinations, the ALJ erred by failing to consider and address his significant and longstanding behavioral problems that are well-supported in the record. Compounding this lack of analysis is the complete absence of any discussion of X.J.H.'s toilet and personal hygiene issues while concluding that he had only moderate limitations in the area of adapting or managing oneself.

Based on a review of the entire record, the Court concludes that the decision to deny SSI is not supported by substantial evidence. Thus, this matter must be remanded to the Commissioner for further review.

## V.    Conclusion

For these reasons, the Court will grant summary judgment in favor of Plaintiff and remand the case to the Commissioner for further review.

An appropriate order follows.

Date: June 29, 2026                    BY THE COURT:


/s/ Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

13